547 So.2d 154 (1989)
Nathan J. RAKITA and Rose C. Forman and Southeast Bank, N.A., As Co-Personal Representatives of the Estate of Harry Forman, Deceased, Appellants,
v.
Richard A. ROSE, Appellee.
Nos. 88-1446, 88-1550.
District Court of Appeal of Florida, Third District.
May 30, 1989.
Rehearing Denied September 5, 1989.
*155 McDermott, Will & Emery and James E. Betke, Lawrence R. Metsch, and John Schriver, Chicago, Ill., for the Estate of Harry Forman and its co-personal representatives/appellants; Herzfeld and Rubin and Myron Shapiro and Judy D. Shapiro, Miami, for appellant Forman, individually.
Grutman Greene Bjork and Norman Roy Grutman and Donald Zimmerman, New York City, Wallace Engels Pertnoy Solowsky, Newman & Allen, P.A., Miami, for appellee.
Before FERGUSON, JORGENSON and LEVY, JJ.
JORGENSON, Judge.
In their consolidated appeal,[1] Nathan Rakita, Rose Forman and Southeast Bank, co-personal representatives of Harry Forman's estate, and Rose Forman, in her individual capacity, appeal from a judgment for $1,500,000 in compensatory damages, $1,000,000 in punitive damages, and an award of prejudgment interest. For the following reasons, we reverse the trial court's order denying Forman and Rakita's motion for a directed verdict and on remand direct the trial court to enter judgment for the defendants.
In 1977, Richard Rose planned and developed federally subsidized housing for the elderly on Miami Beach. Rose obtained financing for the project from Rakman Development Company (Rakman), a company owned by Harry Forman and Nathan Rakita. The three men formed a partnership, Terrace Limited, by a written agreement dated February 23, 1977. The agreement provided that Rose would assign certain purchase options, the commitment from the United States Department of Housing and Urban Development for long-term rent subsidies, and all of his work product, including plans, designs, and drawings, to the partnership. Rose was to be the general partner, with a 1% interest. The agreement stated that Rose was to remain general partner at Rakman's sufferance; Rakman retained the right to require Rose to sell his partnership interest to Rakman for $100. Pursuant to the agreement, Rose was to receive the following:
(a) $100,000 when permanent mortgage financing was obtained;
(b) $200,000 when the apartment units were fully occupied, payable $10,000 per quarter for five years;
(c) 50% of the "cash flow," or profits, beginning six years after the project attained full occupancy.
Rakman retained the right to sell the project at any time, provided the sale was to a stranger. Upon such a sale, Rakman was to pay Rose $100,000, less profits Rose *156 had already received; Rose's entitlement to 50% of the profits would then end.
Less than five months after the partnership was formed, Richard Rose resigned as partner. On July 14, 1977, Rose, Forman, and Rakita signed a letter acknowledging Rose's resignation. The letter contained the following provisions:
[W]e acknowledge receipt of your resignation and agree that your resignation and our acceptance thereof will not prejudice your right to the payment of monies due you as provided for in our agreement dated February 23, 1977... . We further agree that our respective obligations, duties, and responsibilities to each other, are those which are set forth and described in the aforementioned agreement of February 23, 1977... .
On April 1, 1978, permanent financing was obtained for the project. Rakman paid Rose $85,000 directly and paid Rose's real estate broker $15,000, thereby discharging the agreed-upon $100,000 payment to Rose. Full occupancy of the project occurred in April, 1978, and Rose began receiving the agreed-upon quarterly payments of $10,000. By April, 1983, Rose had received the full $200,000 to which he was entitled.
The project, the Lulav Square Apartments, was wildly successful. Instead of the anticipated $30,000 per year profits, the project realized profits of over $200,000 per year, due to increased federal rent subsidies.
In 1984, Terrace Ltd. arranged the sale of the Lulav project to Art Deco Beach Associates. Secondary financing was obtained through Miami Beach Housing, Inc. In contemplation of this sale, pursuant to the partnership agreement of February 23, 1977, Rakman offered to pay Rose $100,000. Rose refused the offer and filed suit against Rakita, Harry Forman, and Rose Forman, Harry Forman's wife.[2]
In his complaint, Rose alleged, inter alia, that Forman and Rakita had breached the agreements of February 23, 1977, and July 14, 1977, by failing to pay Rose his 50% interest in the cash flow. Rose also alleged that, even after his resignation from Terrace as general partner, he remained in a fiduciary relationship with Forman and Rakita and that Forman and Rakita had breached their fiduciary duties to him by conspiring to sell the project to terminate his rights to 50% of the profits.[3]
Central to Rose's case was his contention in his pleadings and testimony that the secondary financing which was obtained upon the sale to Art Deco rendered the sale "illegal," and somehow compromised the Lulav project. Rose alleged that the trust indenture of April 1, 1978, between Miami Beach Housing, Inc., the bond issuer, and Southeast Bank, the indenture trustee, prohibited secondary financing.
At trial, Rose testified that he had received all payments due him except for 50% of the profits and that, had the project "been sold legally, in a bona fide way," he "would not be here today." He further stated that, although the partnership agreement of 1977 did not restrict a sale of the property to only a "legal" sale, his conclusion that only a sale which was "legal" would end his right to receive 50% of the cash flow was "an assumption I make about the country I live in." Rose admitted resigning from Terrace in 1977, prior to the execution of the trust indenture, and repeatedly refused to answer the question of whether he remained any kind of partner after his resignation.
Rose testified that the agreement he signed in February, 1977, did not prohibit secondary financing and that there was no way to know in 1977 whether a lender who would place permanent financing on the project would prohibit secondary financing. In fact, Rose testified that he himself had expressed an interest in buying the project in 1984 and had planned to obtain secondary financing to enable that purchase.
*157 Rakita, Rose Forman, and the co-personal representatives of Harry Forman's estate moved for a directed verdict at the conclusion of Rose's case and at the close of all the evidence. The trial court denied both motions. The jury returned a verdict which found that a fiduciary relationship existed between Rose and the defendants after July 14, 1977; that defendants had breached their fiduciary duty to Rose; and that defendants had breached their contractual obligations to Rose. The jury awarded $1,500,000 in compensatory damages against all defendants, jointly and severally, $500,000 in punitive damages against Nathan Rakita, and $500,000 in punitive damages against the estate of Harry Forman.[4]
We are aware of the weight which our judicial system generally ascribes to a jury verdict, and we recognize that "an appellate court should not `substitute its judgment for that of a jury when the jury has resolved the conflicts in the evidence and has determined the issues of fact'." South Carolina Ins. Co. v. Wolf, 331 So.2d 337, 339 (Fla. 1st DCA 1976) (quoting Glass v. Parrish, 51 So.2d 717, 721 (Fla. 1951)). We are mindful, however, that an appellate court should override a jury verdict when "there is no competent substantial evidence which sustains the jury's verdict or, stated in another form, when the verdict is against the manifest weight of the evidence." Id. at 721. A district court of appeal cannot affirm a verdict which rests "on a mere probability or guess," or a verdict which "has no rational predicate in the evidence." Blanford v. Polk County, 410 So.2d 667 (Fla. 2d DCA 1982); Titan Agencies, Inc. v. S. Kornreich & Sons, Inc., 355 So.2d 457 (Fla. 3d DCA 1978); Food Fair Stores of Fla., Inc. v. Sommer, 111 So.2d 743 (Fla. 3d DCA 1959).
We have carefully reviewed the entire record in this case and conclude that the defendants were entitled to a directed verdict at the close of all the evidence. Rose sought damages for breach of fiduciary duty and breach of contract. The documents and record testimony reveal neither the existence of a fiduciary duty between Rose and Forman and Rakita, nor a breach of either the February, 1977, partnership agreement or the July 14, 1977, resignation acceptance.
There was no evidence that a fiduciary relationship remained after Rose's resignation from Terrace, Ltd., or if one remained that any breach occurred. Rose transferred his partnership interest to Rakman for $100; upon that transfer, his relationship with Terrace, save for those contractual rights mentioned in the July 14 resignation letter, terminated. See Gerstel v. Arens, 143 Fla. 20, 26, 196 So. 616, 618 (1940) ("the transfer by a partner to his copartner of all his interest in the firm carries with it all claims which the seller has against the firm ...") (quoting 47 C.J. 796, section 239 (1929)); see generally 8 Fla.Jur.Business Relationships § 534 (1978); 59A Am.Jur.2d Partnership § 391 (1987) ("Apart from the rights of creditors, the continuing partner or partners to whom a departing partner transfers his partnership interest become entitled to the exclusive possession of the firm property and vested with complete title thereof").[5] Forman and Rakita were *158 therefore as free, after Rose's resignation, to sell the project to a "stranger" as they were before Rose's resignation. Rose himself admitted at trial that, had they sold the project to a buyer for cash, he would not have cause to complain.
There was no evidence of a breach of contract. Rose admitted receiving all payments due him under the February, 1977, agreement except for 50% of the cash flow. Under the terms of that agreement, Rose's entitlement to those profits would end upon sale of the project to a "stranger," and payment to Rose of $100,000. The project was sold to Art Deco; there is no dispute over whether Art Deco was such a "stranger." Rose received payment of $100,000; his rights to 50% of the cash flow ended. The 1977 agreement nowhere restricts sale of the project to an all-cash deal and nowhere prohibits a potential buyer from obtaining secondary financing. The trust indenture between the bond issuer and the trustee bars secondary financing, but Rose had resigned from the partnership before the indenture was created and thus was not a party to that indenture. There is no theory of law which allows Rose to rely on that prohibition in the trust indenture to override the clear terms of the February, 1977, agreement. Moreover, there is no evidence in the record to show that either of the parties to the trust indenture or The Hartford Insurance Group which owns the bonds raised any objection to the sale to Art Deco.
Because there is no substantial competent evidence to support the verdict and because the verdict has no rational predicate in the evidence, we reverse the order denying defendant's motion for a directed verdict and, on remand, direct that judgment for the defendants be entered on the directed verdict.
Reversed and remanded with directions.
NOTES
[1] On motion of the parties, the record was consolidated for both cases. We have consolidated these cases on our own motion.
[2] Harry Forman died soon after Rose filed suit; his estate and its co-personal representatives were substituted as parties.
[3] Rose's complaint originally contained eleven counts. Three counts were dismissed by the trial court; Rose voluntarily dismissed all other counts except those for breach of fiduciary duty and breach of contract.
[4] Because we reverse the trial court's order denying the defendants' motion for a directed verdict, we do not reach the issue of whether Lohr v. Byrd, 522 So.2d 845 (Fla. 1988), which bars the assessment of punitive damages against a deceased tortfeasor's estate, applies retroactively. We likewise do not reach the issue of whether Rose Forman could be held liable for breach of contract and breach of fiduciary duty, and whether prejudgment interest was properly awarded.
[5] There is some authority for the proposition that, even when a partner withdraws from a partnership, fiduciary duties continue, especially when one of the parties remains in charge of a continuing partnership business. 59A Am.Jur.2d Partnership § 431 (1987). There is also authority for the proposition that "when a partnership is dissolved the fiduciary relationship terminates, where the agreement for dissolution is consummated and the parties thereafter deal with each other at arms length." Id. and cases cited therein. Neither the parties' briefs nor this court's research reveals any Florida authority directly on point. However, because there was no evidence to support a finding that any breach of fiduciary duty occurred, we need not decide whether such a duty existed after Rose resigned from the partnership.